# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs May 25, 2010 at Knoxville

## STATE OF TENNESSEE v. GARY WAYNE ARMSTRONG

**Appeal from the Circuit Court for Marshall County**
**No. 2009-CR-33      Robert Crigler, Judge**

---

**No. M2009-02482-CCA-R3-CD - Filed August 19, 2010**

---

The defendant, Gary Wayne Armstrong, appeals from his Marshall County Circuit Court jury convictions of assault and aggravated assault. He claims that the evidence was insufficient to support the convictions and that the trial court erroneously sentenced him. Upon our review of the record, we affirm the trial court's judgments.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Donna Orr Hargrove, District Public Defender; and William Harold and Michael J. Collins, Assistant District Public Defenders, for the appellant, Gary Wayne Armstrong.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The charges as alleged in the indictment stemmed from an August 23, 2006 incident wherein Kenneth Pugmire was the victim.

At trial, the 70-year-old victim testified that, on August 23, 2006, he was recovering from back injuries sustained from a 28-foot fall that occurred during his employment as an oil refinery construction superintendent. He testified that he had undergone 13 major operations to repair damage from the fall, that he was 83 percent disabled due to radiation exposure, and that, as of August 23, 2006, he had been out of the hospital approximately six weeks.

The victim testified that he ordered fill dirt to be brought to his property by Hargrove Trucking and that the dump trucks hauling the dirt began arriving on August 23, 2006. The defendant drove one of the Hargrove dump trucks to the site and positioned the load 75 yards away from the dump location that the victim had indicated by hand signals. The victim testified that he was concerned that the defendant had turned the truck around in the area where the victim's septic tank was buried. The victim walked up to the open driver's window of the defendant's truck and said, "You need to keep that GD truck out of that field. I've got a septic tank down there." He testified that the defendant showed "no recognition whatsoever." The victim testified that the defendant "[t]hen pulls ahead, backs up, dumps his truck pretty much where he wanted to."

William C. "Sonny" Hargrove, the owner of the trucking company, had delivered another load of dirt to the site. The victim testified that he told Mr. Hargrove that something had to be done to keep the defendant out of the field where the septic tank was located and that the defendant should dump his loads where the victim directed. Mr. Hargrove told the victim that he would take care of it. The two dump trucks left, and other trucks with other drivers arrived and dumped the dirt as the victim directed.

When the trucks driven by Mr. Hargrove and by the defendant returned with new loads, Mr. Hargrove dumped his load of dirt where the victim directed, and then Mr. Hargrove replaced the defendant as the driver of the second truck and dumped the load as directed. The defendant stood and watched as Mr. Hargrove dumped the load. The process of dumping fill dirt by a total of six trucks continued at intervals, and the victim used his tractor blade to disperse and level the dirt.

When the defendant returned the third time, he began to dump his load 20 feet away from where the victim needed it, and the victim walked toward the truck and "hollered." He testified that the defendant gave "no recognition," and the victim "reached up and slapped [the truck] door with [his] hand to get [the defendant's] attention." The defendant backed up some but remained short of the indicated dump site, dumped some of the load, "pop[ped]" the clutch in pulling forward, and "raised the front wheels . . . off the ground about four feet." The victim testified that he had experience in operating dump trucks and knew that the antic was intentional. The victim told the defendant, "I don't want to see you out here again."

The victim testified that the defendant came out of the truck "on top of" the victim and hit the victim in the face, knocking him to the ground. The victim testified that the two struggled on the ground, that the defendant got to his feet, and that the victim threw some dirt at the defendant, "trying to get him . . . away," because the victim was afraid the defendant was going to attack him again. The victim testified that the defendant then

retrieved a tire iron from the truck and "came out swinging." The victim testified that the tire iron was approximately 30 inches long and three fourths of an inch in diameter. The victim, who had gotten off the ground, fell again because of his previous back injuries. He testified that he lay on his back kicking at the defendant while the defendant "was coming at [him] and beating [him] with that bar." The victim testified that the defendant struck him "several times" on the legs and feet with the tire iron. He received a bloody nose. The victim testified that he feared getting a "real beating." The victim agreed with the prosecutor that all of the blows were very offensive and that he feared bodily injury. Matthew Hargrove, the driver of another dump truck, came running and stopped the defendant's beating of the victim. The victim exhibited to his testimony photographs depicting a black eye and contusions on an upper leg, and he testified that the injuries resulted from the defendant's assaults.

After the defendant was pulled off the victim, the defendant got in his truck and left. The victim did not seek medical attention and did not call the police; however, on the following day, he swore out a warrant against the defendant.

Sonny Hargrove testified that his company delivered fill dirt to the victim's property and that he employed the defendant as a driver. Mr. Hargrove acknowledged that the victim objected to the way the defendant drove on the property and dumped his load of dirt. Mr. Hargrove told the defendant that when they returned with their second loads, Mr. Hargrove would dump the defendant's load. Mr. Hargrove described the tire irons in his trucks as about 18 to 20 inches long, consisting of solid metal approximately five eighths of an inch in diameter. He opined that the iron weighed about four or five pounds.

Matthew Hargrove testified that he is the son of Sonny Hargrove, that he worked for his father's trucking company, and that he was the driver who stopped the defendant's beating of the victim on August 23, 2006. Matthew Hargrove testified that after he had dumped a load of dirt onto the victim's property and was about to leave, he saw in his rear-view mirror the victim lying on the ground and the defendant "swinging a metal tire bar at him." He jumped from his truck and ran toward the defendant, yelling at him to get away from the victim. He testified that he saw the defendant hit the victim with the metal bar in the legs and in the upper torso. He testified that as he "got closer and hollered at [the defendant] some more, [the defendant] stopped swinging and backed up." Matthew Hargove ordered the defendant back into his truck. He described the victim as hyperventilating, with blood coming from his nose. He testified that the defendant drove his truck up behind Matthew Hargove's truck, which was blocking the exit, and blew his horn a few times, "[y]ou know, act[ing] pretty mad."

The defendant testified that he drove a dump truck for Hargrove Trucking and that he hauled dirt to the victim's property in August 2006. He testified that, when he

delivered his first load, the victim "got to shouting and screaming" about the way the defendant turned his truck. He testified that the victim would bang on the truck door and call him a "god damn n*****." The defendant testified that he then became "a little bit upset." The defendant testified that he told Mr. Hargrove that he did not wish to deliver dirt to the victim again but that Mr. Hargrove told him he needed the defendant to do so. The defendant denied that Mr. Hargrove dumped the defendant's second load and maintained that he dumped the load himself and did so "right where Sonny was dumping at." Nevertheless, the victim screamed at him again and used the same racial epithet. The defendant testified that Mr. Hargrove again refused the defendant's request to stop delivering to the victim.

The defendant testified that on the third trip, he began dumping his load right beside where Matthew Hargove had dumped his load but that the victim nevertheless began screaming at him again, calling him a "dumb n*****." He testified that, after he dumped his load, he got out of his truck and told the victim that he would not tolerate the victim's name-calling and that, as he was going back to his truck, the victim "picked up a big ball of dirt and knocked me in the back." "And that's when," the defendant testified, "I went around . . . and got the pipe out." The defendant testified that when he came back around the truck toward the victim's location, the victim "had another chunk of dirt in his hand, raising up to hit [him] again." The defendant testified that when he then "raised the pipe up," the victim tripped and fell. The defendant testified that he laughed at the victim and that Matthew Hargrove then came up and saw the victim "laying [sic] down with the pipe in [the defendant's] hand." The defendant denied ever hitting or swinging the bar at the victim.

On cross-examination, the defendant testified that Mr. Hargrove fired him that day because of the incident with the victim.

Based upon the testimony, the jury convicted the defendant of aggravated assault and three counts of assault. The trial court merged all three assault verdicts into the conviction of aggravated assault.

In the defendant's sentencing hearing, Loranda Borja, the presentence investigator, testified that the defendant reported that he got out of his truck to scare the victim. She testified that the 50-year-old defendant was convicted of hindering a secured creditor in May 2009, assault in 2007, misdemeanor thefts in 1999 and 1998, assault in 1996, robbery in 1985, misdemeanor theft in 1984, and forgery of prescriptions, possession of drugs, and evading arrest in 1983. She testified that the defendant's 1998 and 1983 probations were revoked.

The victim testified that he was 67 years old when the defendant assaulted him. At that time, his lung capacity was severely diminished due to radiation exposure and

silicosis, and he was disabled from the 28-foot fall and the resulting surgeries. He testified that he was unable to defend himself against the defendant's attack.

The defendant testified in the sentencing hearing that the presentence report's reference to 1983 convictions of forgery was erroneous, that he was not the person convicted in those cases. He reiterated his trial testimony that he only approached the victim to object to the victim's racial name-calling.

The trial court sentenced the defendant to four years and six months to serve as a Range I offender in the Department of Correction. It based the length of sentence upon two enhancement factors, that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," *see* T.C.A. § 40-35-114(1) (2006), and that he, "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community," *see id.* § 40-35-114(8). In denying probation or other sentencing alternatives to confinement, the trial court found that confinement was "necessary to protect society by restraining a defendant who has a long history of criminal conduct," *see id.* § 40-35-103(1)(A), and "to avoid depreciating the seriousness of the offense," *see id.* § 40-35-103(1)(B). The court also found that "[m]easures less restrictive than confinement had been frequently or recently applied unsuccessfully to the defendant." *See id.* § 40-35-103(1)(C).

In his first issue, the defendant challenges the sufficiency of the evidence convicting him of aggravated assault. He asserts in his brief that the State failed to prove that the victim sustained a serious bodily injury and that the defendant used a deadly weapon with the intent necessary to commit an aggravated assault. We disagree.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all

reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in the indictment, the defendant was charged with aggravated assault via "intentionally or knowingly caus[ing] bodily injury to [the victim], committing an assault as defined in Tennessee Code Annotated [s]ection 39-13-101, in that the [defendant] did . . . use or display a deadly weapon, to wit: a metal bar." As such, the charge tracks the mode of aggravated assault described in Tennessee Code Annotated section 39-13-102(a)(1)(B): "A person commits aggravated assault who. . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon . . . ." T.C.A. § 39-13-102(a)(1)(B). Also, the mode of section 39-13-101 assault chosen as the base offense for aggravated assault was that the defendant "[i]ntentionally, knowingly or recklessly cause[d] bodily injury to another." *See id.* § 39-13-101(a)(1).

Although bodily injury via section 39-13-101(a)(1) was an element of the offense charged, serious bodily injury was not. For aggravating the assault, the State did not opt to use section 39-13-102(a)(1)(A), which, as an alternative to including the use or display of a deadly weapon as an aggravating element, specifies that the assault must cause "serious" bodily injury to the victim. *See id.* § 39-13-102(a)(1)(A). For this reason, the State was required to prove mere bodily injury and the use or display of a deadly weapon, but it was not required to prove that the victim suffered serious bodily injury. Thus, the defendant's claim that the State failed to prove serious bodily injury is unavailing.

In the light most favorable to the State, we discern that the State proved that the assault resulted in bodily injury to the victim. As reflected in the testimony and the exhibits, the victim sustained a black eye, a cut nose, and one or more bruises on his leg. *See id.* § 39-11-106(2) ("'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty.").

We also conclude that the State established that the defendant used a deadly weapon. Both the victim and Matthew Hargrove testified that the defendant used a heavy metal bar to strike the victim while he lay prone on the ground. *See id.* § 39-11-106(5)(B) ("'Deadly weapon' means . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury."). The jury having accredited this testimony over that of the defendant, the verdict of assault committed through the use of a deadly weapon is amply supported.

The defendant also claims that the trial court erred in imposing a four-year, six-month sentence in confinement. Aggravated assault as committed by the defendant is a Class C felony. *Id.* § 39-13-102 (e)(1). As a Range I offender, the defendant was subject to a

sentencing range of three to six years. *See id.* §§ 40-35-111(c), -112(a)(3).

When considering a challenge to the manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). Our case law has long held that the presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Carter*, 254 S.W.3d at 344; *Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination, a trial court, at the conclusion of a sentencing hearing, is obliged to determine the propriety of sentencing alternatives by considering:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

As the recipient of a Class C felony conviction, the defendant is considered a favorable candidate for alternative sentencing. *See id.* § 40-35-102(6). "[F]avorable status consideration," however, does not equate to a presumption of such status. *Carter*, 254 S.W.3d at 347, and the sentencing issues are to be determined by the facts and circumstances presented in each case. *State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

As the recipient of a sentence of ten years or less, the defendant was also eligible for probation. *See* T.C.A. § 40-35-303(a). He bore the burden, however, of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). A defendant seeking full probation bears the burden of showing that probation will "subserve the ends of justice and the best interest of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (Tenn. 1956)), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978).

In the present case, the trial court relied heavily upon the defendant's previous history of criminal convictions or criminal behavior, *see* T.C.A. § 40-35-114(1), and his failure to comply with the conditions of a sentence involving release into the community, *see id.* § 40-35-114(8), to enhance the sentence to the mid-range point. The record supports this decision. Although the defendant's prior criminal record consists mainly of misdemeanor convictions, such a record will justify sentence enhancement pursuant to factor (1). *State v. Sam Avery Wilhoite*, No. M2008-01190-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Nashville, July 24, 2009) ("We note that misdemeanor convictions alone may support enhancement of a sentence based on prior criminal record."); *see also State v. Ramsey*, 903 S.W.2d 709, 714 (Tenn. Crim. App. 1995). The record also established for purposes of factor (8) that on a prior occasion the defendant's probation had been revoked. Thus, we may not disturb the trial court's selection of a four-year, six-month sentence.

Nor may we disturb the trial court's denial of alternative sentencing. The trial

court found that confinement was necessary to protect society by restraining a defendant who has a long history of criminal conduct, *see* T.C.A. § 40-35-103(1)(A), and to avoid depreciating the seriousness of the offense or confinement, *see id.* § 40-35-103(1)(B). The court also found that measures less restrictive than confinement had been frequently or recently been applied unsuccessfully to the defendant. *See id.* § 40-35-103(1)(C). At a minimum, the record supports the denial of alternative sentencing based upon the defendant's lengthy criminal record and the failure of prior measures less restrictive than confinement.

Consequently, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE